Good morning. May it please the Court, I am Attorney Larry Johns. I represent Dr. James E. Tinnell. We are the appellant. This appeal raises two issues. One is the intersection between patent law and Nevada state contract law. And the second is the question of the conflict between two orders of the lower court. One which found quite clearly that there were material issues of fact as to the construction of the contract which required a trial for a jury to resolve this issue. The second of which said, in effect, well, even if there are issues of fact, I have now determined that Brulat is so sweeping in its application that it is not necessary to have a trial to resolve these contractual issues. Essentially, the facts, although set forth, can be very briefly restated. Dr. Tinnell, a practicing physician in 1976, invented. Well, the question then becomes, in this determination of the conflict, whether or not the granting of summary judgment on the issue of that there was no material fact in dispute, and or that even though there were issues of fact not in dispute, that Brulat is overriding is the key issue in the case. There's one extremely significant finding that appears in both orders. Both 140, which was the first one, found that there was no material fact of the issue in dispute. And in the second one, he found that Brulat was overriding. And that is the finding that the 936 patent, and this is the 1981 patent that was applied for in 1978, never provided patent monopoly protection for products sold by Xyla. That appears in both of the orders, and that's significant. And it's significant for the following reason. Brulat, in all cases that have construed it, and it has very serious effects, obviously, upon inventors, only has application where there is a product that's covered by a patent. In this case, had there never been a patent, Dr. Tunnell would be receiving to this day royalties on not only the original liquid solution that would be mixed in his laboratory, but he would be receiving royalties on the Xylactin products because it was very clear by all three of the founders of this and all three signatories that the intent was for him to receive royalties on all products sold. And at the time that that agreement was entered into, and we're looking back 26 years now, and the district court was looking back more than 20 years after that agreement was founded, it was the original intent that he would receive these royalties on products that were sold that he invented, and that was the first part. And then the second product that was actually marketed, and that was the Xylactin, which is still sold in the stores to this day. You're saying all products, including improvements? Yes. That was the intent at the time, and it must be understood that Dr. Tunnell was a practicing physician in Los Angeles. Well, the term improvements does not appear in the 1980 agreement. It does not appear in the section discussing royalties. And the reason for that is because it was understood that he would receive royalties, according to all three of the people who signed it, on anything that was sold. It never occurred to them. They didn't even discuss or contemplate that patents would affect it. Patent law came into play, in this case, in 2000, 20 years after the fact, when the Patent Council instructed the company not to pay any further royalties based upon the expiration of a 1981 patent, a 1934 patent. Let me just ask this question. And I do understand it to be one of the major arguments of your opponents. It's that, in this agreement, the term is often used, inventions, improvements thereon, and letters of patent thereon, in other subsections. But in the subsection on the royalty, it only says sales by Duesenberg of the invention. Correct. And so the question is whether it isn't a term of art in this contract such that it applies only to the invention as it existed in 1981, leaving aside the patent, which was the liquid form of it. No, of course not. That was not the intent. I'm just asking, why isn't that a fair reading of the contract? Because, as I'm suggesting to you, that was not the intent of the parties that drafted it. How do we know that? Because that's what they testified to. They all retestified it. But aren't you saying that really that that's the reason summary judgment shouldn't have been granted? There is a dispute as to what the meaning of that is. All right. There is very definitely a dispute. All three of the signatories to the agreement will testify to the contrary. All right. Now, my understanding of your argument about why one argument why Berlach doesn't apply is because the original patent was never effective to produce a product. So that patent is just irrelevant. And this is really an agreement insofar as it was actually operative to pay royalties on whatever was produced, patented or not. Right. That's correct. All right. The second possibility, which I understand you to be raising, is the last patent doctrine. Yes. And that leads to this very strange business about the last patent here, which was not in Mr. Connell's name. Yes. So how does that fit in? What do you do with that? Well, what I do with it is that we presented compelling evidence, and I think it's set forth in here, that he did invent that, Xylactin. He is the one who went to the chemist at Colmar, Mr. Reinhart, and the testimonies in here, and said, I need a product that we can market that contains a cellulosic combination. But what does it require? A counterclaim or something in order to demonstrate that the patent either wasn't good or should be reformed or something to that effect in order to then trigger the last patent doctrine? Or does it not matter for purposes of the last patent doctrine who had the last patent? It doesn't matter. Because? Well, in this particular case, Dr. Connell, all the evidence shows he did invent it. He invented it, but it doesn't hold the patent. So insofar as anything turns on the existence of the patent, I mean, wouldn't the patent have to be straightened out first before you could invoke that doctrine? No, I don't think so, and I'll tell you why. Because in 1987, when this issue came up, Dr. Connell was told by the patent counsel, Mr. Drummond, and this is in the testimony that's in the brief, you will receive royalties on this invention. And that was the testimony that he gave, not in this case, but in the Colgate v. Palmolive case that was filed in 1994. When questioned by counsel for Colgate, he admitted that he told Dr. Connell, you will receive royalties on this invention, and this is the patent counsel. Now, the mistake that was made was made by the patent counsel, not by Dr. Connell. When the patent was applied for, Mr. Drummond mistakenly referred to the cellulosic ingredient as methylcellulose, whereas, in fact, it was and always had been hydroxypropylcellulose. Mr. Drummond then decided in early 1988 that he would reapply, and reapplied under the name of Edwin Pomeranz. And he reapplied. The patent was identical. There was nothing different except his mistaken identification of the cellulosic thickener. The claims were the same. Everything was the same. So it was the mistake made by the attorney. Is there any explanation for why he changed the name of the person who got the patent? That's a very big deal. There probably was in the Colgate case. It was a contested, a very contested piece of litigation that was resolved by settlement in 1995. There may have been a cont because they filed a patent infringement case against Colgate in Arizona over this, and that matter was battled out for a year or two years before there was a settlement agreement, pursuant to which Xylactin was protected and is still protected to this day until 2009. So there was a dispute there. Well, regardless of who is the proper inventor or the patent should reflect, your position is that you're entitled to royalties on the invention and any upgrade of the invention. And what in the agreement says that in so many words? Yes. That was the intent of the parties, but it's more than that. That's your position. But what in the agreement says that the invention or any upgrade of it through other patents or modifications, you're still entitled to royalties? Well, respectfully, there's another concept of contract law that is very important in Nevada, if not in all states, and that is, and this was established through the testimony in the case, it's not just what the intent of the parties was. It's also how the parties implement that intent. And over 20 years, there was never a dispute. And you received royalties even with the new patent? Received royalties on the product. That would be evidence that they agreed that you got royalties not only on the original invention, but any upgrade of it. So you're saying an evidentiary hearing would be necessary? Or try it on an evidentiary hearing. You're seeking a trial, a jury trial. And that's one of the reliefs. That's one aspect of it. The other is that if Brulot is actually applied in this case, it's very clear that in every case that's discussed the patent use doctrine, the last applicable patent is the one that governs. We're not asking to receive royalties beyond 2009 January. On your first theory, you would be, actually. Yes, we did. On the first theory that you enunciated this morning, you would be saying we weren't being paid for the patent at all. We were only being paid for the agreement itself, and that Brulot didn't preclude that. I apologize if I misled you. That's not what I meant to say. I'm sorry. What I meant to say was that if there had been no patent, the original intent was exactly that. Unfortunately, there was a patent which invokes Brulot. Now, Dr. Tinnell may not have realized that. Dr. McKay may not have realized that. Mr. Gordican may not have realized it. But there was and is a patent on this product, and under Brulot. I understood you to be saying, yes, but that patent, the original patent, the one that's applied, referred to here, was never incorporated into a product that's sold. That's correct. And no royalties were paid on anything except the product that became patented. All right. But the product was an invention that did or did not incorporate the patent. But you're saying that fairly readily that there's a dispute of fact as to what the agreement says that you're entitled to royalties on, and whether or not the invention included or didn't include patents, you're entitled to royalties on the invention. Is that your position? No, our position is, well, our position is we're entitled to royalties on the product that is now marketed as Xylactone. Dr. Tinnell named it. Until the later patent. Until the 2009. So you're essentially saying, and if I can revise what I understood you to say earlier, that the only relevant patent is really the second one, because the first one was never operative. Exactly. But even with the first one not being the 1981 patent not being operative, you were still entitled to royalties on that invention. Yes. So that even though there wasn't a patent on it originally, that you were entitled to royalties on that, and then when the new patent came into being, you continue to be entitled to royalties on it. And the lower court actually. Only to the life of the second patent. Exactly. Even if Dr. Tinnell wanted to, we can't possibly extend the length of the royalties beyond the expiration of the 2009 patent. That's what ERLAT stands for. Sorry, doc. You don't get anything beyond that. This is the product. It's patented. It has patent protection. You litigated with Colgate in Phoenix over this years ago. This is it. And that's those, that product and the royalties and the revenues that were derived from it was the basis for the royalties that he received through 2000. Well, they say they meant respect to the patent of these royalties. I mean, that's part of the set off saying that the patent ran and that you were not entitled to anything except royalties on a patent. Then he shouldn't have been. If that theory is correct, he should never have received a doctorate. From day one. From day one. He should never have received a doctorate. It flies in the face of 20 years of corporate history. And the Colgate litigation. And the Colgate litigation. And the doctorate. And Mr. Drummond's testimony. The board of directors meeting in 1989 when the board sat down and Dr. Tinnell abstained and they agreed to pay him 5% royalties on sales of the product worldwide. And that was this product that was under the pending patent that Dr. Tinnell had in mind. But it wasn't this product. Your argument now is that it wasn't this product. That it was. That that pending patent was not for this product. In fact, because. The pending patent in 1987. Yes, but in 1980 when the vote was. Not the 1981 patent. No, never. Nothing was ever sold under the 1981 patent. What I'm saying is when the board met, the pending patent was the patent that was issued in 1992. It was? I thought the board. I thought the board met in 1989. But. I'm sorry. I'm confused. I thought that you were talking about the board meeting that produced this agreement. No, no. This agreement was September 25th of 1980. The board met in 1989 to discuss Dr. Tinnell's rights under the new pending patent application. I see. It started in 1987 and ultimately took four years. Granted in 1992. Okay. If you want to reserve any time. I would like to reserve. Thank you very much. Thank you and may it please the court. My name is Ray Romella and with me is my colleague, Rebecca Van Dorn. We represent Silent Inc. in this matter. Your honors, I'd like to put this case in this appropriate context right out of the gate here. The position taken by Tinnell consistently below had nothing to do with Brulot. The consistent position taken below dealt with their belief that they were entitled to royalties in perpetuity. That's what he contended all along. He filed this complaint, paragraph four of his answering complaint. He's not claiming that now. Pardon me? But he's not claiming that now. I understand that. But his position has completely changed. It doesn't matter because we're dealing with a summary judgment and the question is. I understand that, your honor, but I will move on. Your honor, the two things you need to look at in this case are, one, the contract. The contract is clear and it's unambiguous on its face. And under Nevada law, you have to give effect to the clear and unambiguous terms of the contract. And that was the Ringel case we cited for you. And what does the contract say, the 1980 agreement say? The 1980 agreement tells us that there is a royalty provision. And the royalty provision expressly ties the obligation to pay royalties to the patent. So why did you pay so many why did you pay him for so many years when you yourself now claim, claim he was not entitled to them? His position is that the use for all this period of time bespeaks the fact that he was entitled to royalties even though he didn't, wasn't entitled to anything on the 1981 patent. We've always said he was entitled to something under the 1981 patent and we continue to pay him royalties thereafter. All right. But you have a. I'm sorry. First of all, it isn't true that the royalty provision ties back to the patent. It ties back to the invention. It doesn't say anything about the patent. Correctly, which was then defined as the patent pending which became the invention. I'm sorry, where? I thought he was entitled to royalties on the invention. He is entitled to royalties on the invention, Your Honor. Where is this definition you're talking about? In the whereas clause. The first whereas clause, Your Honor, it states the invention being described in and detailed by an application for United States letters patent. But there's all kinds of that agreement that money goes. Let me ask you this. Yes, sir. What is the invention? Explain to me what the invention is. The invention was a three-acid solution. That was the patent pending which ultimately became the patented invention. That was the three-acid solution consisting of boric acid, salicylic acid and tannic acid. Well, that's the substance, this commodity is the invention, right? Yes, sir. Now, why can't this agreement be read fairly reasonably, if someone wants to read it that way, saying that it includes not only that, but any upgrade to the invention by a subsequent patent? Because, Your Honor, that's not what the agreement says. What the agreement ties royalties to is the invention, the three acids. All right. This is my understanding. You're saying why did you pay him royalties for all these years, just a minute, on a product that included the invention, that is, included this formula, but also included a later patented way of using it? Because. Because it included the invention, right? Yes, Your Honor. Okay. I'm sorry. Right? Is that right? Yes, Your Honor. Okay. So that being the case, then why doesn't the Brulat Last Patent Doctrine come in? It still includes the invention. This product now has – still includes the invention, right? Yes, Your Honor. And it still has a patent on it. But the invention patent expired. The invention patent isn't what it says. It says invention. All right? So you're still selling something that has the invention and that has a patent on it. Your Honor, the invention was the three-acid solution that was described in the letter's patent. That's right. And it's still in the product. And then there was a new patent. That's right. And there was a new patent. Why does the invention include any upgrade of the invention through a new patent? Because, Your Honor, the agreement didn't – the agreement did not provide for improved patents to be subject to the royalty agreement. All right. But I'm saying something a little different, okay? Brulat says that you – that as modified by the last patent doctrine, seems to say that the agreement here seems to have been for a payment on the invention. It says nothing about the patent. But we know because of Brulat that when you have a contract that has both a patent aspect and if it was just the invention, the invention was never patented, it wouldn't have a problem. Right? I think that's correct. Okay? So why don't we read Brulat and the last patent doctrine to say the following? He is allowed to have – to get a royalty on the invention. You've been paying him all along on the invention because it was incorporated in your product. Yes, Your Honor. Right? Your product still has a patent on it. And he is entitled to get paid on the invention to the – up until the last patent expired. Why not? Because that improvement wasn't envisioned in the royalty provision, Your Honor. But you're paying – but you've been paying him with the improvement all along. Because that improvement incorporated the invention, Your Honor, that was the subject of the royalty provision. And it still does. So insofar as there's a barrier from Brulat that says even if you've agreed to pay on the invention, you can't do it if there's a patent because you can't do it beyond the last patent, that would explain why once the patent – the last patent runs out, you can't do it anymore. But why does it explain the fact – I understand this is not the way you've been thinking about the case. But try and think about it. Because I don't see once you concede that he's been – and you have to – that he's been paid all along on the invention as incorporated in a separate patented – Your Honor, if I could, that's partially true and it's partially not true. They have consistently told you on appeal that he was never paid any royalties on the invention. That is not true. He received royalties starting in 1982 and continuing forward. Zyla did the right thing when they did come up with the Xylactin product. They continued to pay him on the Xylactin product because that product incorporated the invention. If, for instance, they had taken boric acid out of the underlying solution, we wouldn't have had any obligation to continue making royalty payments. Because it wouldn't be the invention anymore. But not – you see, one of the things that you're turning around is that the royalty provision doesn't say patent. It says invention. And that was what was contemplated by the letters patent, which was the three-acid solution, Your Honor. Well, I might be not seeing the true issue here, but as I understand, reading the agreement, his position is he's entitled to royalties on this invention and any improvements made to the invention. What's wrong with him having that position? Fairly read under the agreement. And saying that this latest patent, which hasn't run yet, is still part of the invention. But that was contrary to what he asserted below, and I realize it was – Well, we're dealing with the record before us on a summary judgment motion, and whether or not there's a question of fact for the district court to resolve. I understand that. His position is, under the contract between the parties, that he was entitled to royalties on the invention or any upgrade of the invention. His position is there's been a subsequent patent, which has not run yet, which upgraded this patent – upgraded this invention. Ergo, he's entitled to continue commissions under the agreement. What's wrong with that analysis? Well, again, Your Honor, that is not what the agreement says. Well, the question is, why can't the agreement be read to say that? I'm not saying your position should be that, but why can't a reasonable person read the agreement and say, yes, he's entitled to any – he's entitled to royalties on this invention and any upgrade to it? What in the agreement rules out that – looking at the agreement in that way? Okay. And I will try my – one, the agreement does not provide for that. But, two, if you look at the agreement, the agreement parcels out various items of intellectual property throughout. Mind you, the record demonstrates that Dr. Tunnell was the one that dictated the basic terms of this agreement. He was the founder of this company. He owned the majority of the shares. He dictated the terms of this agreement to his co-promoters. His co-promoters and him then, in turn, had their attorneys draft this thing. My point is, throughout this agreement – and this is short – throughout this agreement, various items of intellectual property are parceled out and distinguished. Nowhere in the royalty provision does it provide for improvements on the invention. But isn't the real problem this? Nobody who wrote this agreement was contemplating the Brulac doctrine. The Brulac doctrine comes in on top of whatever anybody's intent was and distorts it to some degree, as many people have pointed out. So since you have that problem, it isn't terribly useful to be entirely purist about what the intent was of the parties because almost surely their actual intent was that he was to be paid forever, as long as the invention was incorporated in any product, and you'd lose summarily if it wasn't for Brulac. Is that much so? Well, one, I don't think Brulac distorts it because obviously the idea of that doctrine is you don't want to project Pat Monopo. I understand, but I'm saying if you just look at this document, the original 1980 agreement as written, and forgot about Brulac, you have to lose. You can't be right. Your position can't be right. Your position depends on Brulac. Because Brulac applies, yes. Yes. Okay. So therefore, in light of that, to be talking about this use of the term invention in the contract, in terms of what their intent was, you know, we pretty much know what their intent was. Their intent was that as long as this invention was in anything, he was going to get paid. But the question is, how does Brulac walk in and say, sorry, you can't get paid? That's the question you have to answer. One, in terms of the agreement. And if I could, please. I'm sorry. I'm not understanding that. Because as I just explained to you, it's only because of Brulac, which is not in the agreement, that we aren't simply saying, well, fine, he said he's going to get paid a royalty on the invention. The invention is still incorporated in your product. He's going to get paid. It would be a very short case. The only reason it's not a very short case is because of Brulac. And I understand that. And this notion of the last patent, to interpret the agreement as they're urging, there would have to be patents and improvements thereon. That is not what's in the agreement. And I know. Yeah, but why is it so crazy to interpret the agreement in that way, when you yourself interpreted it that way and paid him all the money after the second patent improved the agreement? He's saying, look, this is what we meant. We meant the invention as well as any upgrade of it through patents, even though it doesn't say so. He says it. And you say, no, it didn't include any subsequent patent, only the first patent. And you say the agreement reads 100%. You can't read it any other way on summary judgment. But yet you yourself read it to state that he's entitled to royalties even on this second patent. I think that goes to you have lay people reading an agreement, and they believe. And you're stuck with it, whether they're lay people or not. You have corporate. We're not dealing with idiots here. We're dealing with grown people that know what they're doing, and big doves. So you're not talking with someone who doesn't know what they're doing. You're dealing with a commercial case here. You're trying to rule out any other meaning to this agreement. And he states that, look, it has at most an ambiguity to it. You yourself read it as hidden and entitled to these royalties. So how can you say that on appeal that it can only be read one way when your people yourselves read it as his entitlement? What the parties read it as was that there was a perpetual right to royalties. And Brulotte tells us that is wrong. I will grant you that, Your Honor. But Brulotte does stop it at some point. The patent was the patent. The patent was the three-asset solution that was incorporated into the patent. Plus any upgrade to it, which happens to be this subsequent patent. Why can't a reasonable jury read it that way? Let's put it that way. Not us. Because under Nevada law, for one, you're going to have to interpret a contract as it's written. You go by the plain meaning in Nevada, and what Nevada tells us is you have to read the contract, and that's what the trial judge eventually ruled in Order 161. You have to read a contract as it's written. My point is I don't understand how that rule can be applied to a contract, which is not being read as written because of an overriding legal limitation on as written. I mean, you look perplexed, but as I said before, it seems to me that if we were to read it as written without Brulotte, you have to lose. If the Brulotte doctrine did not exist. So, therefore, what does it mean to say that we're going to read it as written? Because as written, it didn't contemplate Brulotte. But you don't get to the intent of the parties under Nevada law, Your Honor, when interpreting a contract. But what I'm saying is if I read it as written, I would say, well, of course he's supposed to get paid for the invention. The invention is still incorporated in the product. He gets paid forever. Forever. Forever. So I can't read it as written. So you can't mean that. You can still read it as written, but still applying the Brulotte doctrine. I understand what you're saying. But that is true. When this case started, Appellant had not a clue about the Brulotte doctrine. They urged all the way through summary judgment. So what we're really doing is applying the Brulotte doctrine. We're really not reading this contract as written. We can't. Your Honor, I respectfully disagree, because that is not what the contract says. Is your position that under the contract he was entitled to no improvement in this invention? Is that your position? I didn't understand, Your Honor. Is it your position that he was entitled to no improvement on the invention? If he upgraded the invention with a patent or otherwise, is it your position that he was entitled to no improvement, royalties on that new product that was upgraded? Yes, on improvements to the invention. That's correct. Patented improvements he would not be entitled to. Okay. Then, okay. Your position is that would he be entitled to royalties if the improvement were not by way of patent, if it were just on a ‑‑ it were not an invention. It was, you know, something that is in the public domain. If the patent was still in existence on the underlying patent. No patent. There was an improvement on the original invention, but it wasn't patentable because it couldn't be patent. Right. Would he continue to receive royalties on that upgraded invention even though it wasn't a new patent? Yes, so long as two conditions are met. One, it contains a three-asset solution that was part of the underlying patent. And two, the underlying patent hasn't expired. So, yes, he would be able to. Okay. So what's the difference between that and upgrading it with a new patent? I don't think there is a discernible difference because the reason he was paid royalties was because the product, Xylactin, contained the three-asset solution that was the subject of the patent that entitled him to royalties. And it still does. So ultimately our question is a question of Brulotte law. Right. Which is, does the fact that the underlying ‑‑ it's really a question of how does the last patent doctrine apply into Brulotte? The last patent doctrine, if you look at Brulotte and all the other cases applying Brulotte, Dolby, what you had was an agreement, a license agreement or an assignment agreement, what have you, that specifically said what the patents were that were being incorporated into the invention. Right. Then the last patent, subject to that agreement that expired, you're done. There's no more royalties. Yeah, but you're saying that when the 1981 patent expired, that was it, that was the end of it. But you, I think, didn't you acknowledge that he was entitled to not only whatever the invention was in 1980, but any upgrade to that invention? Now, an upgrade to that invention is a new patent, and aren't you obligated even under that agreement to pay, and you could bail out after that patent expires? Again, and maybe I'm not understanding, our obligation to pay royalties to him, we continued to do that past 1998, because on the new invention, on the patented invention, the Pomerantz invention. Now, we're not talking about past 1998. We're talking about between before 1998. Yes, Your Honor. Before 1998. After the new patent, we continued to pay him on that invention for the Xylactin product, for the 1991 patent, because that's. I mean, in fact, my understanding is the earlier stuff was never even marketed. That's not true. That's not true. That is absolutely untrue, Your Honor, and that is in the record. submitted an affidavit down below. He received royalties from 1982, well before this new invention. I see. Okay. All the way on. That's part of the record. Okay. And he received over $3.2 million in royalties. Okay. All right. But we continued to pay him after the Xylactin product because we had an obligation to, because it incorporated the three-acid solution that was part of the earlier patent that was part of the invention. It still does. That's where I keep getting stuck. It still does incorporate that invention. If you read the contract. If you read the contract to say that it applies to patented improvements, which it does not say that, it ties it to the patent, the invention, which was the patent, which was the three-acid solution. And if you look to the record at ER 16. You know what? Since you only have a minute left and since we have somewhat going around in circles, what about the Canadian piece of this? That has to be wrong, does it not? Well, Your Honor, we did concede below that he was owed the 56, but that it served as an offset, yes. And then you have this offset argument. Yes, Your Honor. And the offset being because you overpaid him. Now, isn't there a case law that says specifically in the patent area that you don't, if people don't challenge the patent at the appropriate time, that you don't get a rebate for improperly paid license fees? I'm not aware of that authority, Your Honor. Well, there is. And there's a good reason for that because of precisely what happened here, which is that you challenged the patent later rather than earlier, essentially. Well, I think you're talking about the patent invalidity cases where you were. Well, that's right. But why don't they apply by analogy? Because what those cases deal with is somebody that's basically engaging in gamesmanship, and that is. The question is the patent was valid. That's what you're saying. Well, that's right. But weren't you, in essence, dealing in gamesmanship by paying in order. It was a mistake. Go ahead. Your Honor, it was a mistake. To make sure that you could continue to use it and nonetheless then challenging it. That line of authority you're talking about is cases where you have a licensee who suspects that maybe there's an invalidity problem. Right. Sits back, doesn't do anything, and waits to see what happens. And then, lo and behold, later they say, oh, the patent was declared invalid, even though they had those suspicions, then wants to take a bite of the apple. Well, you're essentially saying it's unenforceable against you. You're not saying it's invalid, but you're saying it's not enforceable against us. We've never said that the patent is invalid. But you're saying that the license is unenforceable against you. License requirement, the requirement that you. There was no license. This was an assignment. I'm sorry. The assignment. And it was valid up until that point. I understand you looking at this case and saying, well, you know, it was the party's intention. And it was the party's intention. I'm not standing before this court and saying the party's didn't intend. But, mind you, it was Dr. Tunnell who was the company. Yes, but that was long before the 1998 decision to continue to pay him. Right. So in 1998 it wasn't true, and he was continued to be paid for two years, and you're now saying we shouldn't have. Yes, Your Honor. If I could say one thing about that. You know, they make this point that Mr. Drummond, who was the patent counsel, told Zile that the patent expired. He did, in fact, tell them that the patent expired back in 1997. He told this to a regulatory person. He didn't tell them you have to stop paying royalties at that time. And I would just submit to you, when you tell somebody, a layperson, that a patent expires, because the very situation happened here, they're not going to take the next logical legal leap and say, oh, therefore, under the Brillat Doctrine, my obligation to pay patent royalties expires. So it's a wholly different situation. He did tell them that the patent expires, the regulatory person. But it wasn't like he told them that the obligation to quit paying royalties. But this is a strange business, because, again, it's not really that it's unjust in a contractual sense. Again, if you just look at the contract, he did have an obligation to pay him. It's only inconsistent with Brillat on your theory. Oh, there's no question that Brillat applies to this case. It's just basically the issue. It's when. I understand when. When, when, under which. All right. Thank you very much for your argument. It was illuminating. I will just have one comment, unless you have questions. First of all, with regard to Mr. Drummond informing one of the officers, it was Edwin Pomerantz, and unfortunately, Mr. Pomerantz died during the course of this before we had an opportunity to propose it. The point is we haven't told now. We haven't told the President. We haven't told anyone until 2000, the summer of 2000, to stop paying the royalty. What's the relevance of that to anyone? It just responds to the question as to whether or not the actual. Well, that's a jury argument. That's not a legal argument. Again, we think. Is it your understanding that, I mean, if we were to reverse the summary judgment and you went to the jury, what would you be going to the jury on, on the contract or on the application of Brillat? We would be going to the jury on the contract which would allow us the royalties through 2009. We don't contend, we can't contend, that the royalties that have been paid since the 1992 patent have been based upon anything except this patented product. There is nothing else except the Xalactin products. The Court would have to invoke Brillat to cut them off at that point. That's the reason that we think that the last patent doctrine under Brillat, we believe, should allow this Court to reverse it and grant that relief. What about the contention that the last patent doctrine all deals with cases in which there were a series of patents contemplated at the outset and that, therefore, the limitation on the contract only ran as long as the last contract? That was contemplated at the time the contract was entered into. That was actually implied for. I would argue that the concept of more patents was contemplated. As a matter of fact, Dr. Finnell's obligation was not only to seek to improve, but to get patents and to testify. In the Colgate case, he was testifying pursuant to this agreement to protect. He was required to come and testify to protect the 1992 patent, and that's when it all came out that he had invented it. So we're asking that you invoke Brillat because the most we could ever get. Well, if we reverse it, are we to remand for a trial? You're saying? I'm saying we could also reverse and find that under Brillat, properly applied. And we made this argument with the judge below. We don't need a trial. He's entitled to his royalties through the expiration of the 1992 patent, which will expire in January 2009. Okay. Thank you very much for your arguments. The case of Zillow v. Chinell is submitted, and we are in adjournment. Thank you very much. All rise. Thank you. Thank you. First question. Thank you. Thank you.
judges: D.W. Nelson, Cowen, Berzon